Brian CASEY, Plaintiff,

v.

Ronald SMITH, John Zeverino,
Taylor Truck Line, Inc., Allstate Property
and Casualty Insurance Company,
Austin Mutual Insurance Company and
Health Partners, Defendants,

ACCEPTANCE CASUALTY INSURANCE COMPANY,
Defendant-Appellant,

GREAT WEST CASUALTY COMPANY,
Defendant-Respondent.

Court of Appeals

No. 2012AP667. *Submitted on briefs December 17, 2012.*
*—Decided January 15, 2013.*

2013 WI App 24

(Also reported in 827 N.W.2d 917.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Charles J. Noel* of *Charles J. Noel & Associates, P.A.*, Minneapolis, MN.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Michael W. McNee* and *Tamara L. Novotny* of *Cousineau McGuire Chartered*, Minneapolis, MN.

Before Hoover, P.J., Mangerson, J., and Thomas Cane, Reserve Judge.

¶ 1. CANE, J. This case involves an insurance coverage dispute arising out of a multi-vehicle accident that took place on February 27, 2009. One of the vehicles involved was a semi-tractor owned and operated by John Zeverino, but leased to Taylor Truck Line, Inc. Taylor had a commercial automobile policy through Great West Casualty Company, and Zeverino had a non-trucking use automobile policy through Acceptance Casualty Insurance Company. The circuit court determined the Acceptance policy provided coverage for claims stemming from the accident, and the Great West policy did not, because Zeverino was not acting "in the business of" Taylor at the time of the accident. We agree, and therefore affirm the summary judgment in favor of Great West.

## BACKGROUND[1]

¶ 2. On October 10, 2006, Zeverino leased a Freightliner semi-tractor he owned to Taylor, pursuant to an "Independent Contractor Equipment Lease Agreement." The agreement provided that Zeverino would use the tractor "to transport, load and unload on behalf of [Taylor] . . . such traffic as [Taylor] may from time to time make available to [Zeverino.]" The agreement further specified that Taylor would have "exclusive possession, control and use" of the tractor and would "assume complete responsibility to the public for the operation of [the tractor]" during the term of the lease. It also provided that Zeverino would be respon-

---

[1] Great West's brief contains no citations to the record; instead, Great West cites only to Acceptance's appendix. We admonish Great West that WIS. STAT. RULES 809.19(1)(d) and (e) require appropriate citations to the record on appeal, and references to a brief's appendix are not in conformity with the rules. *See United Rentals, Inc. v. City of Madison*, 2007 WI App 131, ¶ 1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322.

sible for "[m]aintaining the [tractor] in the state of repair required by all regulations" and would bear all repair and maintenance expenses.

¶ 3. In addition, Taylor and Zeverino each agreed to maintain certain insurance, which was to provide coverage for the tractor depending on how it was being used. Taylor agreed "to provide and maintain insurance coverage for the protection of the public from damage to persons and property[.]" However, Taylor's insurance would be in effect only when the tractor was "being operated in the exclusive service of [Taylor] and while actually engaged in transportation for [Taylor.]"

¶ 4. Zeverino, in turn, agreed to "indemnify and hold [Taylor] harmless from all claims relating to [Zeverino's] bobtailing of the equipment[.]" In trucking industry parlance, "bobtailing" means driving a tractor without an attached trailer. *See Continental Cas. Co. v. Transport Indem. Co.*, 16 Wis. 2d 189, 192, 114 N.W.2d 137 (1962). Zeverino also agreed to carry "so-called bobtail liability insurance coverage with respect to public liability or property damage . . . as concerns all equipment hereunder when not used in performance of a trip under this agreement." Bobtail insurance is another name for non-trucking use insurance, which generally covers a tractor when it is not being used for trucking purposes. *See Royal Indem. Co. v. Providence Washington Ins. Co.*, 707 N.E.2d 425, 426 n.1 (N.Y. 1998).

¶ 5. In accordance with the lease agreement, Taylor obtained a commercial automobile policy from Great West, which provided $1,000,000 in liability coverage. Zeverino obtained a non-trucking use policy from Acceptance, which also had a $1,000,000 liability limit.

¶ 6. In January 2009, Zeverino drove the tractor to FABCO, a Caterpillar dealership in Eau Claire,

Wisconsin, to have its electronic control module adjusted. While performing the adjustment, FABCO damaged the tractor's grille. FABCO ordered a new grille, and called Zeverino when it arrived. Instead of making an appointment to replace the grille, FABCO instructed Zeverino to stop by whenever it was convenient. In addition, Zeverino had previously ordered a new oil filler tube for the tractor after the existing tube broke off at the engine block. FABCO offered to install the new tube at the same time it replaced the grille.

¶ 7. On February 27, 2009, Zeverino had the day off work. He set out from his home and began driving his tractor to FABCO to have the grille replaced. He planned to return home after FABCO completed the work. No one from Taylor knew that he was going to FABCO, and he was not doing so pursuant to any orders or instructions from Taylor. He did not consider himself to be acting "in the business of Taylor" at the time, and he was not pulling a trailer or any other freight. However, while driving to FABCO, Zeverino's daily driver's log reflected that he was "driving," rather than "off duty."

¶ 8. At his deposition, Zeverino testified he "needed to get [the grille] repaired" because it was "already starting to fall apart and fall off on the highway." He stated the repairs were necessary for the tractor to operate "the way [he] needed it to . . . as an owner, operator for [Taylor.]" However, he conceded the broken grille and oil filler tube did not prevent him from hauling loads on Taylor's behalf. He also admitted the tractor was never placed out of service because of these defects.

¶ 9. On the way to FABCO, Zeverino was involved in an accident with three other vehicles, including one driven by Brian Casey. At the accident scene, a Wisconsin state trooper conducted a "Level I" inspection of Zeverino's tractor, the most comprehensive type of

post-accident inspection, and completed a "Driver/Vehicle Examination Report." The report noted that no violations were discovered during the inspection of the tractor. The trooper crossed off the portion of the form requiring certification that "all Out of Service defects . . . have been repaired and the vehicle has been restored to safe operating condition." At the accident scene, Zeverino logged himself as "on duty (not driving)" on his driver's daily log. Following the accident, he drove the tractor to FABCO, where the grille and oil filler tube were replaced as planned.

¶ 10. Casey subsequently sued Zeverino and several other defendants, asserting personal injury claims. A dispute arose between Great West and Acceptance as to which of their policies covered Casey's claims. Both insurers agreed that one, but not both, of their policies afforded coverage. They also agreed that resolution of the coverage issue turned on whether Zeverino was operating the tractor "in the business of" Taylor at the time of the accident. If so, Great West's commercial automobile policy provided coverage; if not, there was coverage under Acceptance's non-trucking use policy.

¶ 11. The matter was submitted to the circuit court on cross-motions for summary judgment. The circuit court agreed with Great West that Zeverino was not acting "in the business of" Taylor at the time of the accident. As a result, the court concluded the Acceptance policy, not the Great West policy, provided coverage. The court granted Great West summary judgment, and Acceptance now appeals.

## DISCUSSION

¶ 12. We review a grant of summary judgment independently, using the same methodology as the

circuit court. *Palisades Collection LLC v. Kalal*, 2010 WI App 38, ¶ 9, 324 Wis. 2d 180, 781 N.W.2d 503. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2).[2]

¶ 13. Here, the facts are undisputed, but the parties disagree as to which insurance policy affords coverage under the facts presented. Interpretation of an insurance policy presents a question of law subject to our independent review. *Greene v. General Cas. Co.*, 216 Wis. 2d 152, 157, 576 N.W.2d 56 (Ct. App. 1997). Our goal in interpreting an insurance policy is to give effect to the parties' intent. *Folkman v. Quamme*, 2003 WI 116, ¶ 16, 264 Wis. 2d 617, 665 N.W.2d 857. If the policy language is unambiguous, we simply enforce it as written. *Marnholtz v. Church Mut. Ins. Co.*, 2012 WI App 53, ¶ 10, 341 Wis. 2d 478, 815 N.W.2d 708. However, we construe ambiguous policy language against the insurer and in favor of coverage. *Id.* Policy language is ambiguous if it is susceptible to more than one reasonable interpretation. *Folkman*, 264 Wis. 2d 617, ¶ 13.

¶ 14. When we interpret an insurance policy, we first examine the policy's insuring agreement to determine whether it makes an initial grant of coverage for the plaintiff's claim. *See Olson v. Farrar*, 2012 WI 3, ¶ 41, 338 Wis. 2d 215, 809 N.W.2d 1. If so, we then determine whether any of the policy's exclusions preclude coverage. *See id.* "[E]xclusions are narrowly construed against the insurer." *Link v. General Cas. Co. of Wis.*, 185 Wis. 2d 394, 399, 518 N.W.2d 261 (Ct. App.

---

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

1994). Finally, we determine whether an exception to an exclusion reinstates coverage. *See Olson*, 338 Wis. 2d 215, ¶ 41.

## I. The Acceptance Policy

¶ 15. Acceptance does not dispute that the non-trucking use policy it issued to Zeverino makes an initial grant of coverage for Casey's claims. However, Acceptance argues two of the policy's exclusions apply. We examine each exclusion in turn.

### A. *Exclusion 14(b)*

¶ 16. Acceptance first contends Exclusion 14(b) precludes coverage for Casey's claims. Exclusion 14(b) states that the insurance provided by the policy does not apply to "a covered 'auto' . . . [w]hile used in the business of anyone to whom the 'auto' is rented[.]" It is undisputed that Zeverino's tractor constitutes a "covered 'auto' " under the policy and that the tractor was rented to Taylor. Thus, the dispositive issue is whether the tractor was being used "in the business of" Taylor at the time of the accident.

¶ 17. The Seventh Circuit Court of Appeals, applying Wisconsin law, has concluded that a tractor is being operated "in the business of" the lessee when "the truck is being used to further the commercial interests of the lessee." *Hartford Ins. Co. v. Occidental Fire & Cas. Co.*, 908 F.2d 235, 237 n.5, 239 (7th Cir. 1990). Acceptance argues Zeverino's tractor was being used to further Taylor's commercial interests because Zeverino was taking the tractor in for repairs at the time of the

accident. Acceptance cites a number of cases in which courts have found that tractors being driven to and from repair sites were being operated in the business of their lessees. However, these cases do not stand for the proposition that every trip made for the purpose of repairing a tractor is in the business of the tractor's lessee. Instead, the repairs must further the lessee's commercial interests by allowing the owner/operator to continue using the trailer in the lessee's business. If the owner/operator could have continued hauling loads for the lessee without obtaining the repairs, then the repairs did not further the lessee's commercial interests.

¶ 18. In *Hartford*, Lykes Transport, a motor carrier, dispatched a tractor owned by Rich Transport to deliver a load of frozen orange juice concentrate from Dade City, Florida to Fort Wayne, Indiana. *Id.* at 236. Before leaving Dade City, the tractor's driver was instructed to have a faulty freon valve on the trailer repaired after he delivered the orange juice. *Id.* However, the trailer leaked so much freon during the trip that the driver had to stop along the way to replenish its supply. *Id.* When the tractor reached Fort Wayne, the customer refused to accept the orange juice because it was too warm. *Id.* Lykes instructed the driver to take the trailer to a nearby cold-storage facility, where the freon valve would be repaired. *Id.* When driving the tractor back to the cold-storage facility the next day to retrieve the trailer, the driver was involved in an accident. *Id.*

¶ 19. The issue on appeal was whether Rich's non-trucking use policy covered claims stemming from the accident. The policy excluded coverage "[w]hile the automobile is being used in the business of any person or organization to whom the automobile is rented." *Id.*

121

at 238. The Seventh Circuit concluded this exclusion applied because the tractor was being used "in the business of" Lykes at the time of the accident. *Id.* The court rejected Lykes' insurer's argument that the trip to repair the freon leak did not further Lykes' commercial interests because it was "not necessary to the continued operation of . . . [Lykes'] business[.]" *Id.* at 240. Instead, the court cited the customer's rejection of the too-warm orange juice as evidence that Lykes' commercial interests would have suffered without the repair. *Id.*

¶ 20. Notably, the *Hartford* court did not consider it dispositive that the accident occurred while the driver was on his way to retrieve a trailer that had been repaired. Rather, the court assessed whether those repairs were necessary to allow Lykes to continue using the trailer in its business. Because the repairs were necessary, the driver's trip to pick up the trailer furthered Lykes' commercial interests, and the driver was therefore acting "in the business of" Lykes.

¶ 21. Acceptance cites *Freed v. Travelers*, 300 F.2d 395, 396–97, 399 (7th Cir. 1962), which involved an accident that took place while a driver was driving his tractor to a garage for repairs. The Seventh Circuit concluded the driver was acting "in the business of" the motor carrier at the time. In *Freed*, however, it was undisputed that "the major repair work done on the tractor was . . . necessary to its continued operation in [the carrier's] business." *Id.* at 398. Thus, *Freed* does not stand for the proposition that any and all repairs to a tractor are automatically "in the business of" the carrier.

¶ 22. Our supreme court addressed a similar issue in *Ehlers v. Gold*, 169 Wis. 494, 173 N.W. 325 (1919). There, a car licensed as a common carrier in the city of Milwaukee was involved in an accident after it had ceased carrying passengers for the day and was on its

way to a repair shop. *Id.* at 495, 498. The car was covered by an indemnity bond, which provided coverage "while said motor vehicle is being operated in the service of a common carrier." *Id.* at 495. On appeal, the liability company that issued the bond claimed the car was not being operated "in the service of a common carrier" at the time of the accident. *Id.* at 498. The court rejected this argument, noting that the car was "running to a repair shop to receive the repairs *necessary* to enable it to continue its service as a common carrier." *Id.* (emphasis added). Accordingly, *Ehlers* supports the proposition that repairs are "in the business of" a carrier only when they are necessary to allow the vehicle to continue operating in the carrier's business.

¶ 23. In this case, the facts establish that the repairs to the tractor's grille and oil filler tube were not necessary for Zeverino to continue operating the tractor in Taylor's business. Admittedly, Zeverino testified that he "needed to get [the grille] repaired" because it was "already starting to fall apart and fall off on the highway[,]" and that the oil filler tube was broken off at the engine block. However, he also admitted these defects did not prevent him from hauling loads on Taylor's behalf. He conceded the tractor was never taken out of service because of the broken grille and oil filler tube. Furthermore, a state trooper conducted a thorough examination of the tractor after the accident and noted no violations or repairs that needed to be made for the tractor to be restored to safe operating condition. These facts establish that Zeverino could have continued operating his tractor in Taylor's business without first repairing the grille and oil filler tube. Consequently, the repairs did not further Taylor's commercial interests, and Zeverino was not acting "in the business of" Taylor at the time of the accident.

¶ 24. Additionally, as Great West points out, courts asked to determine whether a tractor was being operated "in the business of" a motor carrier often consider whether the driver was acting pursuant to the carrier's orders or instructions. *See, e.g., Liberty Mut. Ins. Co. v. Connecticut Indem. Co.*, 55 F.3d 1333, 1337 (7th Cir. 1995) (driver was acting in the business of a motor carrier because he was "under instructions from [the carrier] regarding a specific delivery" and did not "have the freedom to drive his semi-tractor hither and yon in search of other fulfillment"); *Acceptance Ins. Co. v. Canter*, 927 F.2d 1026, 1028 (8th Cir. 1991) (driver was not acting in the business of a motor carrier when he was driving home with no load to deliver, had no instructions to proceed to a particular destination, and was "off-duty and free to spend the weekend as he wished"). Here, Zeverino admitted he did not drive to FABCO pursuant to any orders or instructions from Taylor, and, in fact, no one from Taylor even knew he was going there. Rather, on his day off, he chose to use his free time to take his tractor in for repairs, which were not necessary to make the tractor available for Taylor's use. Based on these facts, we agree with Great West that Zeverino was not "acting in the business of Taylor" at the time of the accident. Consequently, Exclusion 14(b) in Acceptance's policy does not preclude coverage.

¶ 25. Acceptance emphasizes the fact that, pursuant to the lease agreement, Taylor had "exclusive possession, control and use" of the tractor. However, this language is not unique to Taylor and Zeverino's relationship. Instead, it is required by the federal regulations governing motor carriers. *See* 49 C.F.R. § 376.12(1)(c) (written lease must provide that lessee

124

"shall have exclusive possession, control, and use of the equipment for the duration of the lease.").[3]

¶ 26. Moreover, the fact that a motor carrier is given exclusive possession, control, and use of a tractor does not mean the tractor is necessarily operating in the business of the carrier at all times. The Seventh Circuit squarely rejected this argument in *Hartford*, 908 F.2d at 238. The court reasoned that, if the exclusive possession and control clause meant the tractor was always operating in the carrier's business, there would be no reason for a lease agreement to require the owner to purchase bobtail coverage. *Id.* The present case is no different. The lease agreement required Zeverino to obtain bobtail insurance, and therefore clearly recognized there would be occasions when his tractor was not being used in Taylor's business. Thus, that Taylor had exclusive possession, control, and use of the tractor does not mean the tractor was necessarily operating in Taylor's business at the time of the accident.

¶ 27. Acceptance also argues Zeverino must have been acting "in the business of" Taylor when he drove to FABCO because the lease agreement imposed a contractual duty on him to maintain the tractor in the state of repair required by all applicable regulations. Acceptance then cites 49 C.F.R. § 396.3(a)(1), which requires that "[p]arts and accessories shall be in safe and proper operating condition at all times[,]" and 49 C.F.R. § 396.7(a), which prohibits operation of a vehicle "in such condition as to likely cause an accident or breakdown of the vehicle." However, we agree with Great

---

[3] All references to the Code of Federal Regulations are to the 2012 version.

West that there is no evidence Zeverino needed to have the grille and oil filler tube repaired to comply with these regulations.

¶ 28. To the contrary, the evidence shows that Zeverino had been using the tractor without any problems, despite the broken grille and oil filler tube, and that the tractor was never placed out of service because of these defects. Furthermore, the state trooper who inspected the tractor after the accident noted no violations, and Taylor was not required to have the tractor repaired before putting it back into service. Presumably, if the officer believed the tractor was in an unsafe condition or violated federal safety regulations, he would have noted as much on the inspection form.

¶ 29. Acceptance also argues Zeverino was acting "in the business of" Taylor because he was logged as "driving," rather than "off duty," at the time of the accident and as "on duty (not driving)" at the accident scene. However, Acceptance cites no authority for the proposition that a driver's duty status on his daily log is dispositive as to whether he was acting "in the business of" a motor carrier. In fact, in *Liberty Mutual*, 55 F.3d at 1334–35, 1338, the court found a driver was acting "in the business of" a motor carrier even though he was logged as "off duty" when the accident occurred. By the same token, that Zeverino was logged as "driving" does not necessarily mean he was acting "in the business of" Taylor when the accident took place. Instead, we must look to whether Zeverino's trip furthered Taylor's commercial interests, and, as discussed above, we conclude it did not.

¶ 30. Finally, Acceptance points out that the non-trucking use policy it issued to Zeverino cost only $25 per month, while the Great West Policy cost Taylor $1,032,300 per year for all of its "covered autos." Accep-

tance argues "the premiums charged by Great West and Acceptance clearly evidence the fact that Acceptance's non-trucking use policy only affords coverage in very limited circumstances." While that may be true, it does not necessarily follow that this case falls outside the "very limited circumstances" in which Acceptance's policy provides coverage. Instead, like the circuit court, we conclude Exclusion 14(b) does not preclude coverage of Casey's claims.

*B. Exclusion 14(a)*

¶ 31. Acceptance next contends coverage is barred by Exclusion 14(a), which provides that the insurance does not apply to a "a covered 'auto' . . . [w]hile being operated, maintained or used to carry property in any business or en route to or from such business purpose[.]" Acceptance contends this exclusion lists three activities, each of which qualifies as a "business purpose": (1) operation; (2) maintenance; and (3) being used to carry property in any business. Acceptance then notes the exclusion precludes coverage when a covered auto is "en route to" a business purpose. Consequently, Acceptance contends there is no coverage for Casey's claims because the accident occurred while Zeverino was on his way to have the tractor maintained, and maintenance is a business purpose.

¶ 32. Acceptance's proposed interpretation of Exclusion 14(a) produces absurd results. Under Acceptance's interpretation, the mere operation of the tractor, for any reason, would be a business purpose. Consequently, the non-trucking use policy would never provide coverage for claims that arose when the tractor was being driven. Clearly, such a broad interpretation of the exclusion is illogical. Even Acceptance recognizes

127

that there are circumstances in which operation of the tractor would not constitute a business purpose under the policy—for instance, if the owner drove the tractor to a movie theater on his night off. Accordingly, something more than mere operation or maintenance must be necessary for the exclusion to apply.

¶ 33. In contrast, Great West argues Exclusion 14(a) precludes coverage if the tractor is being: (1) operated to carry property in any business; (2) maintained to carry property in any business; or (3) used to carry property in any business. Thus, Great West contends the exclusion does not apply in this case because the tractor was not being operated, maintained, or used *to carry property* at the time of the accident, and was not en route to any of those business purposes. Specifically, while the tractor was en route to being maintained, the maintenance was not necessary to allow the tractor to carry property. *See supra,* ¶ 23.

¶ 34. We agree with Great West's interpretation. Moreover, even if we found the exclusion ambiguous, we would nevertheless construe it against Acceptance and accept the construction suggested by Great West. *See Marnholtz,* 341 Wis. 2d 478, ¶ 10 (ambiguous policy language construed against the drafter); *Link,* 185 Wis. 2d 394 at 399 (exclusions narrowly construed against the insurer); *Day v. Allstate Indem. Co.,* 2011 WI 24, ¶ 26, 332 Wis. 2d 571, 798 N.W.2d 199 (once initial grant of coverage is shown, insurer has burden to establish that an exclusion applies). Consequently, Exclusion 14(a) does not bar coverage of Casey's claims. Because Acceptance does not argue that any other exclusion applies, we agree with the circuit court that Casey's claims are covered under the Acceptance policy.

## II. The Great West Policy

■

¶ 35. In addition to determining that Casey's claims were covered under the Acceptance policy, the circuit court also concluded the Great West policy did not provide coverage. We agree with the court's determination.

¶ 36. The Great West policy states that Great West will "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies[.]" The term "insured" includes:

> e. The owner or anyone else from whom you [Taylor] lease, for more than 30 consecutive days, a covered "auto" with a driver while the covered "auto":
>
> (1) Is being used exclusively in your business as a "trucker"; and
>
> (2) Is being used pursuant to operating rights granted to you by a public authority.

The parties agree that, under this definition, Zeverino qualifies as an insured only if he was acting in Taylor's business at the time of the accident. We have already determined that Zeverino was not acting in the business of Taylor when the accident occurred. *See supra*, ¶¶ 23–24. Consequently, Zeverino is not an insured under the Great West policy, and the policy does not make an initial grant of coverage for Casey's claims. As a result, those claims are not covered under the Great West policy.

*By the Court.*—Judgment affirmed.